**F I L E D**
CLERK, U.S. DISTRICT COURT

1/12/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR  2:23-cr-00014-RGK |
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. § 846: Conspiracy to Aid and Abet the Distribution of Controlled Substances; 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments; 18 U.S.C. § 1956(a)(3)(B): Money Laundering; 18 U.S.C. § 371: Conspiracy; 18 U.S.C. §§ 1960(b)(1), (2), (3): Operating an Unlicensed Money Remitting Business; 18 U.S.C. § 1512(c)(2): Obstruction of an Official Proceeding; 18 U.S.C. § 1001(a)(1): Falsifying and Concealing Material Facts; 21 U.S.C. § 853, 18 U.S.C. § 982, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| DANIEL SHAUN ZILKE, aka "The Englishman," JUAN RACHID DERGAL-ZULBARAN, aka "Jorge Frangie," JEFFREY MARK THOMPSON, aka "The Cowboy," and GUSTAVO ADOLFO ALDANA-MARTINEZ, | |
| Defendants. | |

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.    Federal Reporting Requirements

1.    Under relevant federal law, a "financial institution," as that term is defined in Title 31, United States Code,

Section 5312(a)(2)(R), included a business operating as an informal money transfer system to facilitate the transfer of money domestically or internationally outside of the conventional financial institutions system.

2.    Under federal law, whenever a financial institution received over $10,000 in currency in one transaction or two or more related transactions that occurred within one year, the financial institution was required to file a Currency Transaction Report ("CTR") no later than 15 days after the transaction over $10,000.  If the person who was depositing or withdrawing the currency did not want such a report to be filed, they might try to evade that filing by either making deposits under the $10,000 reporting threshold or taking other steps such as purchasing cashier's checks with the currency under the belief that such purchases need not be reported.

3.    Under federal law, 31 C.F.R. § 1010.100(ff)(5)(i) a "money transmitter" was a person that provided money transmission services by accepting currency, funds, or other items of value that substitute for currency from one person and transmitting that currency, funds or other items of value that substitute for currency to another location or person by any means, including through a financial institution, an electronic funds transfer network, or an informal value transfer system; or, any other person engaged in the transfer of funds.  A "money transmitter" was required to be licensed by both federal and state law, and failure to register under either federal or state law was a federal offense under 18 U.S.C. § 1960.

B.    Trade-Based Money Laundering

4.    Trade-Based Money Laundering ("TBML") was a system of informal value transfer that exploited legitimate businesses and

trade systems to launder the proceeds of illegal activity.  TBML in the drug trafficking context operated as follows:

a.    Drug trafficking conducted within the United States generated large quantities of United States currency ("drug proceeds"), that had to be transferred in some manner to the true owners of that currency, that is, the individuals in other countries who were the sources of the illegal drugs.

b.    Drug traffickers and others who committed illegal acts in the United States were aware that banks and other financial institutions were required to file Currency Transaction Reports ("CTRs") that included the name and identification of the beneficial owner or owners of those funds for any transaction in United States currency in excess of $10,000 and frequently tried to evade these reporting requirements.

c.    In addition, drug traffickers were alert to the high costs of using the conventional banking system, which could include exchange fees when exchanging dollars for pesos and/or wire transfer fees.

d.    In order to evade the high costs of transfer and the government reporting that accompanied the deposit of large amounts of currency into the legitimate banking system, drug traffickers sought other methods of integrating the drug proceeds they accumulated in United States currency into the legitimate financial system so that it could be transferred to the true owners without detection.

e.    Criminal actors such as drug traffickers typically employed brokers or "money consolidators" who each operated as an informal bank where drug traffickers could place their accumulated

1    drug proceeds, typically at lower exchange rates and for lesser fees
2    than those at legitimate financial institutions.

3         f.    Brokers and money consolidators sought out businesses
4    and individuals in other countries who purchased merchandise in the
5    United States and needed U.S. dollars to pay for that merchandise.

6         g.    The dollars were sold in the black market for pesos
7    and used to pay the open invoices of the businesses and individuals
8    who had purchased goods in the United States.

9         h.    When the purchased goods were shipped to the country
10   of the purchaser and sold, the proceeds of those sales were then
11   relinquished to the owner of the drug proceeds in the country where
12   the drugs originated, that is, the drug trafficker whose product
13   generated the United States currency, thus enabling the drug
14   trafficker to avoid the physical transfer of currency across the
15   border and the accompanying risks of seizure and robbery.

16   C.   Bank Accounts Used to Deposit Drug Proceeds

17        5.    "Layering" was the process of introducing funds earned from
18   committing crimes into the legitimate financial system through a
19   series of transactions intended to hide the true source of the funds.

20        6.    "Integration" was the last step in concealing the true
21   source of illegal funds by using those funds for legitimate purposes
22   or transferring the funds elsewhere to further conceal their sources.

23        7.    Defendants DANIEL SHAUN ZILKE, also known as ("aka") "The
24   Englishman," JUAN RACHID DERGAL-ZULBARAN, aka "Jorge Frangie,"
25   JEFFREY MARK THOMPSON, aka "The Cowboy," and GUSTAVO ADOLFO ALDANA-
26   MARTINEZ, and others known and unknown to the Grand Jury, opened,
27   maintained, and used the following bank accounts in the layering and
28   integration of drug proceeds:

1          a.    Defendant ZILKE held, maintained, and controlled bank

2   accounts at:

3               i.    Falcon Bank International, San Antonio, Texas,

4   account number xxxxx2121 in the name of "Daniel Shaun ZILKE;"

5               ii.   Wells Fargo Bank, account number xxxxxx7153 in

6   the name of "Capital MG;" and

7               iii. Bank of America, account number xxxxxx1268 in the

8   name of "Daniel Shaun ZILKE."

9          b.    Defendant THOMPSON held, maintained, controlled, and

10  was the sole owner of bank accounts at:

11              i.    Wells Fargo Bank, Springtown, Texas, account

12  number xxxxxx7024 in the name of "Peace Through Water Foundation;"

13  and

14              ii.   Pinnacle Bank, Springtown, Texas, account number

15  xxxxxx2958 in the name of Rural Projects Investments, LLC.

16         c.    Defendant ALDANA-MARTINEZ held, maintained,

17  controlled, and was the sole owner of a bank account at Bank of

18  America, Pico Rivera, California, account number xxxxx2325 in the

19  name of "Gamar Electronics."

20      8.    These Introductory Allegations are incorporated into each

21  Count of this Indictment.

22

23

24

25

26

27

28

COUNT ONE

[21 U.S.C. § 846]

[DEFENDANTS ZILKE, DERGAL-ZULBARAN, AND THOMPSON]

A.  OBJECT OF THE CONSPIRACY

1.  Beginning in or about October 2015 and continuing until March 13, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants DANIEL SHAUN ZILKE, aka "The Englishman," JUAN RACHID DERGAL-ZULBARAN, aka "Jorge Frangie," and JEFFREY MARK THOMPSON, aka "The Cowboy," and others known and unknown to the Grand Jury knowingly conspired and agreed with each other to commit an offense against the United States, namely, to aid and abet the distribution of controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A) and Title 18, United States Code, Section 2(a).

B.  MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.  Means By Which Defendants Assisted Drug Traffickers to Conceal Their Drug Proceeds

a.  Co-conspirators and others known and unknown to the Grand Jury who were members of drug trafficking organizations based mostly in Mexico and Colombia would import large quantities of cocaine, methamphetamine, heroin, and marijuana into the United States and distribute them through other co-conspirators to cities across the country where they would be sold in large and small quantities.  The sales of these substances would yield large amounts of drug proceeds in United States currency.  Concealment of the drug

6

proceeds from scrutiny by government or banking authorities was crucial to the drug traffickers' ability to profit from their drug importation and distribution scheme.

b.    Defendants ZILKE, THOMPSON, and DERGAL-ZULBARAN were members of a money laundering organization that served these drug trafficking organizations by assisting them in concealing the proceeds of their trade and making the proceeds generated in the United States accessible to them in Mexico and Colombia.  Defendant THOMPSON and Gustavo Adolfo Aldana-Martinez, and others known and unknown to the Grand Jury, would establish and maintain businesses, charities, and other organizations and open bank accounts for the purpose of accepting the drug proceeds.  The defendants would collect the drug proceeds and place them into the legitimate banking system in the United States to conceal the nature, source, location, and ownership of these proceeds as well as to conceal the illegal drug trafficking scheme itself, and to move the drug proceeds beyond the reach of law enforcement.

c.    Members of the drug trafficking organization would notify defendants ZILKE and DERGAL-ZULBARAN of the approximate amount of drug proceeds to be picked up and the location of the pick-up, and supply a telephone number and/or a code to defendant ZILKE or defendant DERGAL-ZULBARAN.  In turn, defendant ZILKE or defendant DERGAL-ZULBARAN would either pick up the drug proceeds themselves or would employ a co-conspirator to pick up the drug proceeds at the time and place agreed upon and supply that person with the code and/or telephone number of the contact who was to deliver the drug proceeds.  Defendants ZILKE and DERGAL-ZULBARAN would either deliver the drug proceeds in cash to defendant THOMPSON personally or would

arrange for the drug proceeds to be delivered to him, or wire transfer or assign others to wire transfer drug proceeds into the accounts established by defendant THOMPSON, Aldana-Martinez, and others.

d.   After arranging delivery of the drug proceeds to co-conspirators, defendant ZILKE or defendant DERGAL-ZULBARAN would give the recipient of the drug proceeds instructions and identifying information for various bank accounts where the funds were to be deposited, including the bank accounts opened and maintained by defendants ZILKE and THOMPSON, Aldana-Martinez, and others known and unknown to the Grand Jury.

2.   <u>Means By Which Defendants Assisted Drug Distributors to Integrate the Drug Proceeds Into the Legitimate Banking System</u>

e.   Defendants ZILKE and DERGAL-ZULBARAN would arrange the movement of these drug proceeds in a manner intended to conceal the sources of the funds through various means including: (1) using the cash to purchase cashier's checks; and (2) depositing cash and/or cashier's checks into multiple bank accounts they held in the names of fictitious businesses and other organizations.

f.   Defendants ZILKE and DERGAL-ZULBARAN would then integrate the funds into the legitimate financial system by depositing cash and/or cashier's checks in third-party bank accounts already owned by the drug trafficking organizations or delivering cash or wire-transferring funds to businesses to pay open invoices for goods sold to unknown third parties.

g.   Defendant THOMPSON, Aldana-Martinez, and others known and unknown to the Grand Jury, would then arrange for the drug proceeds that they received to be deposited into the bank accounts

they had established for this purpose in a manner that would not arouse suspicion of its source.  For example, defendant THOMPSON opened a bank account in the name of a charity he established known as Peace Through Water Foundation, based in Springtown, Texas, where he deposited drug proceeds that he would then wire transfer to bank accounts specified to him by the drug trafficking organizations that owned the drug proceeds.  Similarly, Aldana-Martinez opened accounts in the name of a business called Gamar Electronics that he used for the same purpose, or to pay the open invoices of foreign-based customers who had purchased goods to be shipped and sold outside the United States.

h.   The true owners of the drug proceeds, the drug trafficking organizations, would either access those accounts to collect the proceeds or give defendants ZILKE and THOMPSON, Aldana-Martinez, and others instructions to wire transfer the drug proceeds to other accounts controlled by the drug trafficking organizations. The degree of defendants' success in concealing the drug proceeds would determine the degree to which the defendants' customers for their money laundering services were able to continue to profit from distributing drugs unimpeded by government or financial authorities in the United States and elsewhere.

C.   OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants ZILKE, DERGAL-ZULBARAN, and THOMPSON committed the following overt acts, among others, within the Central District of California and elsewhere:

1.   On or about November 20, 2015, in Las Vegas, Nevada, defendant ZILKE met with an individual he believed to be a

sophisticated money launderer, but who was in reality a confidential source of information for law enforcement ("CS-1"), to arrange for CS-1 to pick up bulk United States currency that was the proceeds of drug trafficking and deposit it into the United States banking system in exchange for a percentage commission.

2.    On or about November 20, 2015, in Las Vegas, Nevada, defendant ZILKE spoke with a law enforcement agent acting undercover, who defendant ZILKE believed to be the money laundering associate of CS-1 ("UC-1") and agreed to meet with UC-1 in person about the laundering of drug proceeds in exchange for a percentage commission.

3.    On or about December 1, 2015, in Seattle, Washington, defendant ZILKE met with UC-1 and CS-1 and, in a recorded conversation, discussed hiring UC-1 and CS-1 to launder drug proceeds in exchange for a percentage commission.

4.    In or about early January 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call, using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Chicago, Illinois, that later proved to be approximately $248,760 in United States currency, and directed CS-1 to deposit it into bank accounts specified by defendant ZILKE as follows: (a) $10,750 to the account of Daniel Shaun ZILKE at Falcon International Bank, Laredo, Texas; (b) $109,900 to the account of F. Electronics USA at BB&T Bank in Tallahassee, Florida; and (c) $119,450 to the account of D. Electronics at Amerasia Bank, New York, New York.

5.    On or about January 22, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Chicago, Illinois, that later proved to be approximately $348,252 in

United States currency, and deposit it into bank accounts later specified by defendant ZILKE as follows: (a) $16,000 to the account of Daniel Shaun ZILKE at Falcon International Bank, San Antonio, Texas; (b) $95,000 to the account of D. Electronics at Amerasia Bank, Miami, Florida; and (c) $225,000 to the account of R. Energy, LLC at Regions Bank, Orlando, Florida.

6.   On or about February 17, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Chicago, Illinois, that later proved to be approximately $155,900 in United States currency, and deposit it into bank accounts later specified by defendant ZILKE as follows: (a) $9,443 to the account of Daniel Shaun ZILKE at Falcon International Bank; and (b) $141,000 to the account of D. Electronics at Amerasia Bank, Miami, Florida.

7.   On or about March 15, 2016, defendant DERGAL-ZULBARAN contacted an individual who he believed to be a sophisticated money launderer but who was in reality an undercover law enforcement agent ("UC-2"), and, in a recorded call, and requested that UC-2 pick up $120,000 in drug proceeds in Las Vegas, Nevada.

8.   On or about April 1, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Atlanta, Georgia, that later proved to be approximately $63,000 in United States currency, and deposit it into bank accounts later specified by defendant ZILKE as follows: (a) $12,667 to the account of Daniel Shaun ZILKE at Falcon International Bank, San Antonio, Texas; and (b) $47,333 to the account of A.P.M.G. at Bank of America, Weston, Florida.

9.   On or about May 5, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Tampa, Florida that later proved to be approximately $150,100 in United States currency, and deposit it into bank accounts later specified by defendant ZILKE as follows: (a) $4,750 to the account of Daniel Shaun ZILKE at Falcon International Bank, San Antonio, Texas; and (b) $140,000 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

10.   On or about May 9, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Atlanta, Georgia, that later proved to be approximately $56,830 in United States currency, and deposit $53,989 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

11.   On or about May 19, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested that CS-1 pick up a large quantity of drug proceeds in Birmingham, Alabama, that later proved to be approximately $349,515 in United States currency, from a co-conspirator who was a distributor of large quantities of drugs, and deposit it into bank accounts later specified by defendant ZILKE as follows: (a) $200,000 to the account of Law Offices of R.M. at Capital One Bank, McAllen, Texas; (b) $122,531 to the account of Gamar Electronics at Bank of America, Pico Rivera, California; and (c) $14,750 to the account of Daniel Shaun ZILKE at Falcon International Bank, Laredo, Texas.

12.   On or about June 4, 2016, defendant ZILKE contacted CS-1 by telephone and, in a recorded call using coded language, requested

that CS-1 pick up a large quantity of drug proceeds in Birmingham, Alabama, that later proved to be approximately $199,865 in United States currency, from a co-conspirator who was a distributor of large quantities of drugs, and deposit it into bank accounts later specified by defendant ZILKE as follows: (a) $138,000 to the account of Peace Through Water at Wells Fargo Bank, Springtown, Texas; (b) $46,000 to Gamar Electronics at Bank of America, Pico Rivera, California; and (c) $8,869 to the account of Daniel Shaun ZILKE at Falcon International Bank, San Antonio, Texas.

13.  On or about June 20, 2016, defendant ZILKE contacted UC-1 by telephone and, in a recorded call using coded language, requested that UC-1 pick up a large quantity of drug proceeds in Tampa, Florida, that later proved to be approximately $349,871 in United States currency, and transfer it into bank accounts later specified by defendant ZILKE as follows: (a) $7,625 to the account of Daniel Shaun ZILKE at Falcon International Bank, Laredo, Texas; (b) $130,000 to the account of Peace Through Water at Wells Fargo Bank, Springtown, Texas; (c) $50,000 to the account of the Law Office of R.M. at Capital One Bank, McAllen, Texas; and (d) $150,000 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

14.  On or about August 11, 2016, defendant ZILKE contacted UC-1 by telephone and, in a recorded call using coded language, requested that UC-1 pick up a large quantity of drug proceeds in Tampa, Florida, that later proved to be approximately $94,880 in United States currency, and transfer the funds to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

15.  On or about August 16, 2016, defendant DERGAL-ZULBARAN contacted UC-2 by telephone and, in a recorded call using coded language, requested that UC-2 arrange for the pickup of a large quantity of drug proceeds in Orlando, Florida, that later proved to be approximately $500,150 in United States currency, and deposit the funds to bank accounts later specified by defendant DERGAL-ZULBARAN as follows: (a) $252,500 to the account of Gamar Electronics at Bank of America, Pico Rivera, California; (b) $27,000 to the account of J.R. at American Express Bank; (c) $10,000 to the account of B.M. at Bank of America, Billerica, Massachusetts; (d) $142,395 to Gamar Electronics at Bank of the West, Pico Rivera, California; (d) $99,000 to the account of Gamar Electronics at East West Bank, Pico Rivera, California; (e) $16,500 to the account of the Law Office of R.M. at Capital One Bank; and (f) $10,500 to the account of Peace Through Water Foundation at Wells Fargo Bank, Springtown, Texas.

16.  On or about August 24, 2016, defendant DERGAL-ZULBARAN contacted UC-2 by telephone and, in a recorded call using coded language, requested that UC-2 arrange for the pickup of a large quantity of drug proceeds in Chicago, Illinois, that later proved to be approximately $149,990 in United States currency, and transfer the funds to bank accounts later specified by defendant DERGAL-ZULBARAN as follows: (a) $100,500 to the account of Peace Through Water Foundation at Wells Fargo, Springtown, Texas; and (b) $44,240 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

17.  On or about August 24, 2016, defendant DERGAL-ZULBARAN contacted UC-2 by telephone, and, in a recorded call using coded language, requested that UC-2 arrange for the pickup of a large

quantity of drug proceeds in Chicago, Illinois, that is, approximately $300,000 in United States currency.

18.  On or about August 31, 2016, defendant DERGAL-ZULBARAN contacted UC-2 by telephone and, in a recorded call using coded language, requested that UC-2 arrange for the pickup of a large quantity of drug proceeds in Chicago, Illinois, that later proved to be approximately $63,000 in United States currency, and deposit the funds to bank accounts later specified by defendant DERGAL-ZULBARAN as follows: (a) $22,500 to the account of N. Corp. at Bank of America/Merrill Lynch; (b) $4,500 to the account of N. Nautikos Corp. at Bank of America/Merrill Lynch; and (c) $33,795 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

19.  On or about September 1, 2016, defendant DERGAL-ZULBARAN contacted UC-1 and, in a recorded telephone call, identified himself as "Juan," a friend of defendant ZILKE, and requested that UC-1 pick up a large quantity of drug proceeds in Palmetto, Florida, with the amount and the transfer instructions to be provided later.

20.  On or about September 7, 2016, in a series of emails, defendant DERGAL-ZULBARAN contacted UC-1 via UC-1's undercover email account, again introduced himself as a friend of defendant ZILKE, and requested that UC-1 pick up a large quantity of drug proceeds in Columbus, Ohio, that is, approximately $300,000, with transfer instructions to be provided later.

21.  On or about September 19, 2016, defendant DERGAL-ZULBARAN contacted UC-2 by telephone and, in a recorded call using coded language, requested that UC-2 arrange for the pickup of a large quantity of drug proceeds in Atlanta, Georgia, that later proved to be approximately $139,980 in United States currency, and later

1  instructed UC-2 to deposit $134,581 to the account of Gamar

2  Electronics at Bank of America, Pico Rivera, California.

3      22.  On or about September 20, 2016, defendant DERGAL-ZULBARAN

4  contacted UC-2 by telephone and, in a recorded call using coded

5  language, requested that UC-2 arrange for the pickup of a large

6  quantity of drug proceeds in Houston, Texas, that later proved to be

7  approximately $100,000 in United States currency, and later

8  instructed UC-2 to deposit $96,500 in the account of Gamar

9  Electronics at Bank of America, Pico Rivera, California.

10      23.  On or about September 28, 2016, defendant DERGAL-ZULBARAN

11  contacted UC-1 by telephone and, in a recorded call using coded

12  language, stated that he had sent UC-1 an email requesting a money

13  pickup in Atlanta of a large quantity of drug proceeds, that is,

14  approximately $300,000 in United States currency, in Atlanta,

15  Georgia, and that he would need the funds returned to him within two

16  to three days.

17      24.  On or about October 3, 2016, defendant DERGAL-ZULBARAN

18  contacted UC-2 by telephone and, in a recorded call using coded

19  language, requested that UC-2 arrange for the pickup of a large

20  quantity of drug proceeds in Houston, Texas, that later proved to be

21  approximately $100,000 in United States currency, and later

22  instructed UC-2 to deposit $96,500 in the account of Gamar

23  Electronics at Bank of America, Pico Rivera, California.

24      25.  On or about October 5, 2016, defendant DERGAL-ZULBARAN

25  contacted UC-2 by telephone and, in a recorded call using coded

26  language, requested that UC-2 arrange for the pickup of a large

27  quantity of drug proceeds in New York, New York, that later proved to

28  be approximately $105,000 in United States currency, to be picked up

in Fort Lee, New Jersey, and deposit the funds to bank accounts later specified by defendant DERGAL-ZULBARAN as follows: (a) $91,900 to the account of Gamar Electronics at Bank of America, Pico Rivera, California; (b) $5,000 to the account of J.A.G-P. at Wells Fargo Bank; and (c) $4,401 to the account of B.M. at Bank of America, Billerica, Massachusetts.

26.  On or about December 14, 2016, defendant DERGAL-ZULBARAN contacted an undercover law enforcement agent acting as a close associate of UC-2 ("UC-3"), by telephone and, in a recorded call using coded language, requested that UC-3 arrange for the pickup of a large quantity of drug proceeds in New York, New York, that later proved to be approximately $49,900 in United States currency and later instructed UC-3 to deposit $48,153.50 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

27.  On or about January 4, 2017, defendant DERGAL-ZULBARAN contacted UC-3 by telephone and, in a recorded call using coded language, requested that UC-3 arrange for the pickup of a large quantity of drug proceeds in New York, New York, that later proved to be approximately $100,000 in United States currency, from a co-conspirator who sold cocaine and heroin, and later instructed UC-3 to deposit $96,500 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

28.  On or about January 9, 2017, defendant DERGAL-ZULBARAN contacted UC-3, by telephone and, in a recorded call using coded language, requested that UC-3 arrange for the pickup of a large amount of drug proceeds in Houston, Texas, that later proved to be approximately $100,015 in United States currency and deposit the funds to bank accounts later specified by defendant DERGAL-ZULBARAN

as follows: (a) $50,000 to the account of E.Z.L. at Wells Fargo Bank; and (b) $46,514.48 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

29.  On or about January 12, 2017, defendant DERGAL-ZULBARAN contacted UC-3 by telephone and, in a recorded call using coded language, requested that UC-3 arrange for the pickup of a large quantity of drug proceeds in Atlanta, Georgia, that later proved to be approximately $300,040 in United States currency, and deposit the funds to two separate bank accounts later specified by defendant DERGAL-ZULBARAN as follows: (a) $189,000 to the account of Gamar Electronics at Bank of America, Pico Rivera, California; and (b) $97,500 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

30.  On or about January 23, 2017, upon being notified that the Gamar Electronics account to which the wire transfer of $97,500 had been directed on January 12, 2017 was closed, defendant DERGAL-ZULBARAN instructed UC-3 by email to deposit the $97,500 to the same Gamar Electronics Bank of America account in Pico Rivera, California where UC-3 had sent the $189,000.

31.  On or about February 2, 2017, defendant DERGAL-ZULBARAN contacted UC-3 by telephone and, in a recorded call using coded language, requested that UC-3 arrange for the pickup of a large quantity of drug proceeds in New York, New York, that later proved to be approximately $100,000 in United States currency, from a co-conspirator who sold cocaine and heroin, and deposit the funds to bank accounts later specified by defendant DERGAL-ZULBARAN as follows: (a) $28,700 to the account of Peace Through Water Foundation at Wells Fargo Bank, Springtown, Texas; (b) $1,000 to the account of

B.M. at Bank of America, Billerica, Massachusetts; and (c) $66,800 to the account of Gamar Electronics at Bank of America, Pico Rivera, California.

32.  On or about February 16, 2017, during a recorded telephone call using coded language, defendant DERGAL-ZULBARAN agreed to launder $105,000 that was represented to him by UC-3 to be drug proceeds, and instructed UC-3 to deposit the funds to defendant THOMPSON's Peace Through Water Foundation account at Wells Fargo Bank, Springtown, Texas.

33.  In or about October 2017, defendant ZILKE established a bank account in the name of Daniel Shaun ZILKE and the account address as defendant THOMPSON's home address in Springtown, Texas, at Bank of America, with account number xxxxxx1268, by depositing $72,570 in United States currency and cashier's checks that were the proceeds of drug trafficking, for the purpose of laundering drug proceeds on behalf of his drug trafficker customers.

34.  On or about August 28, 2018, defendant ZILKE deposited a cashier's check for $99,995 in drug proceeds from C. Trade, Miami, Florida into account number xxxxx1268 at Bank of America in the name of Daniel Shaun ZILKE.

35.  On or about August 29, 2018, defendant ZILKE wire transferred $39,650 in drug proceeds from Bank of America account number xxxxx1268 to the account of G. Corp.

36.  On or about August 29, 2018, defendant ZILKE remitted a cashier's check from Bank of America account number xxxxx1268 in the amount of $15,000 in drug proceeds to R.H.D.

37.  On or about August 29, 2018, defendant ZILKE wire transferred $15,200 in drug proceeds from Bank of America account number xxxxx1268 to the account of I. and E. TE.

38.  On or about August 30, 2018, defendant ZILKE wire transferred $45,000 in drug proceeds from Bank of America account number xxxxx1268 to the account of S.I.P.

39.  On or about September 18, 2018, defendant ZILKE deposited drug proceeds in the amount of $54,400 in United States currency to Bank of America account number xxxxx1268.

40.  On or about September 18, 2018, defendant ZILKE wire transferred $53,659 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of C. Trade Miami.

41.  On or about September 19, 2018, defendant ZILKE deposited drug proceeds in the amount of $35,635 in United States currency to Bank of America account number xxxxx1268.

42.  On or about September 20, 2018, defendant ZILKE wire transferred $33,795 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of C. Trade Miami.

43.  On or about September 20, 2018, defendant ZILKE deposited a cashier's check in the amount of $26,000 in drug proceeds to Bank of America account number xxxxx1268.

44.  On or about September 21, 2018, defendant ZILKE wire transferred $26,500 in drug proceeds to an account in the name of C. Trade Miami.

45.  On or about September 27, 2018, defendant ZILKE deposited drug proceeds in the amount of $50,000 in United States currency to Bank of America account number xxxxx1268.

46.  On or about September 28, 2018, defendant ZILKE deposited drug proceeds in the amount of $71,791 in United States currency to Bank of America account number xxxxx1268.

47.  On or about September 28, 2018, defendant ZILKE wire transferred $30,000 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of E.S. Corp.

48.  On or about September 28, 2018, defendant ZILKE wire transferred $33,350 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of B.A., LLC.

49.  On or about September 28, 2018, defendant ZILKE wire transferred $41,650 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of B.A., LLC.

50.  On or about October 3, 2018, defendant ZILKE deposited drug proceeds in the amount $19,920 in United States currency to Bank of America account number xxxxx1268.

51.  On or about October 3, 2018, defendant ZILKE wire transferred $43,000 in drug proceeds from Bank of America account number xxxxx1269 to an account in the name of E.S. Corp.

52.  On or about October 8, 2018, defendant ZILKE deposited drug proceeds in the amount of $102,040 in United States currency to Bank of America account number xxxxx1268.

53.  On or about October 10, 2018, defendant ZILKE withdrew $102,040 in drug proceeds in United States currency from Bank of America account number xxxxx1268.

54.  On or about October 11, 2018, defendant ZILKE deposited drug proceeds in the amount of $48,010 in United States currency to Bank of America account number xxxxx1268.

55.  On or about October 11, 2018, defendant ZILKE withdrew drug proceeds in the amount of $48,000 in United States currency from Bank of America account number xxxxx1268.

56.  On or about October 11, 2018, defendant ZILKE deposited a cashier's check in the amount of $65,000 in drug proceeds to Bank of America account number xxxxx1268.

57.  On or about October 15, 2018, defendant ZILKE wire transferred $48,000 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of C. Holdings Florida.

58.  On or about October 16, 2018, defendant ZILKE wire transferred $11,000 in drug proceeds from Bank of America account number xxxxx1268 to an account in the name of M.C.H.

59.  On or about July 24, 2019, defendant DERGAL-ZULBARAN, during a recorded telephone call, requested that defendant ZILKE, who was then cooperating with and acting at the direction of law enforcement agents, pick up approximately $99,929 in drug proceeds in Homewood, Illinois, and deposit $97,000 into the account of O.G., LP at Bank of America, Doral, Florida.

60.  On or about August 16, 2019, defendant DERGAL-ZULBARAN, in a recorded call, requested that defendant ZILKE, who was acting at the direction of law enforcement agents, pick up approximately $40,000 in drug proceeds in Commerce, California, and deposit $38,000 to the account of O.G., LP at Bank of America, Doral, Florida.

61.  On or about December 17, 2019, defendant THOMPSON agreed to accept $200,000 in United States currency that defendant ZILKE delivered to defendant THOMPSON and represented to be drug proceeds at the direction of law enforcement agents, and to wire transfer the

funds into an undercover bank account specified by defendant ZILKE at the direction of law enforcement agents.

62.  On or about December 21, 2019, defendant THOMPSON, speaking by telephone in a recorded call with defendant ZILKE, who was acting at the direction of law enforcement agents, stated that he would be able to finish laundering the $200,000 soon.

63.  On or about February 11, 2020, defendant THOMPSON wire transferred $18,500 in official government funds that had been represented to him by defendant ZILKE acting at the direction of law enforcement to be the proceeds of drug trafficking, to an undercover bank account in Los Angeles, California.

64.  On or about March 3, 2020, defendant THOMPSON wire transferred $6,500 in funds that had been represented to him by defendant ZILKE acting at the direction of law enforcement to be the proceeds of drug trafficking, to an undercover bank account in Los Angeles, California.

65.  On or about March 12, 2020, defendant THOMPSON wire transferred $15,000 in funds that had been represented to him by defendant ZILKE acting at the direction of law enforcement to be the proceeds of drug trafficking, to an undercover bank account in Los Angeles, California.

66.  On or about March 13, 2020, defendant THOMPSON wire transferred $10,000 in funds that had been represented to him by defendant ZILKE acting at the direction of law enforcement to be the proceeds of drug trafficking, to an undercover bank account in Los Angeles, California.

COUNT TWO

[18 U.S.C. § 1956(h)]

[ALL DEFENDANTS]

A.  OBJECT OF THE CONSPIRACY

Beginning in or about October 2015 and continuing through March 2020, in Los Angeles County, within the Central District of California and elsewhere, defendants DANIEL SHAUN ZILKE, aka "The Englishman," JUAN RACHID DERGAL-ZULBARAN, aka "Jorge Frangie," JEFFREY MARK THOMPSON, aka "The Cowboy," and GUSTAVO ADOLFO ALDANA-MARTINEZ, and others known and unknown to the Grand Jury, conspired and agreed with each other to commit an offense against the United States, namely:

To conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of a specified unlawful activity, that is, the felony importation, receiving, concealment, buying, selling, and otherwise dealing in controlled substances punishable under the laws of the United States, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

1  B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

2         ACCOMPLISHED

3         The object of the conspiracy was to be accomplished, in

4  substance, by the Means alleged in Count One, Section B of this

5  Indictment which are re-alleged and incorporated by reference herein.

6  C.    OVERT ACTS

7         On or about the following dates, in furtherance of the

8  conspiracy and to accomplish its object, defendants ZILKE, DERGAL-

9  ZULBARAN, THOMPSON, and ALDANA-MARTINEZ committed the following overt

10 acts, among others, within the Central District of California and

11 elsewhere:

12        The Overt Acts 1 through 66 alleged in Count One, Section C of

13 this Indictment are re-alleged and incorporated by reference herein.

14        67.  On or about August 22, 2016, defendant ALDANA-MARTINEZ

15 accepted a wire transfer of drug proceeds from an unknown sender that

16 was in reality a DEA undercover bank account set up for the purpose

17 of collecting and dispersing drug proceeds as directed by drug

18 traffickers during undercover operations, in the amount of $252,500

19 to his Gamar Electronics account at Bank of America, Pico Rivera,

20 California, within the Central District of California.

21        68.  On or about August 29, 2016, defendant ALDANA-MARTINEZ

22 accepted a wire transfer of drug proceeds from an unknown sender that

23 was in reality a DEA undercover bank account set up for the purpose

24 of collecting and dispersing drug proceeds as directed by drug

25 traffickers during undercover operations, in the amount of $44,240 to

26 his Gamar Electronics account at Bank of America, Pico Rivera,

27 California, within the Central District of California.

28

69.  On or about August 30, 2016, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $6,350 to the account of an unrelated company, G. Technology Inc., in partial payment for an order of electronics in the name of a second unrelated company, A. Enterprise Inc.

70.  On or about August 30, 2016, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $10,300 to the account of an unrelated company, N. Supplies Inc, in partial payment for an order in the name of a second unrelated company, A. Enterprise Inc.

71.  On or about August 31, 2016, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $30,750 to the account of an unrelated company, M. Distributing, in partial payment for an order in the name of a company called Z.F.D.

72.  On or about August 31, 2016, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $81,987 to the account of an unrelated company, C. Trade LLC, which wire funded a wire transfer of drug proceeds in the amount of $27,930 to the account of a second unrelated company, M.M. Export, in partial payment for an order of cellphones by C. Trade LLC.

73.  On or about August 31, 2016, defendant ALDANA-MARTINEZ wire transferred drug proceeds in the amount of $82,345 to the account of an unrelated company, M. Supply LLC, which wire funded (a) a wire transfer of drug proceeds in the amount of $32,423.50 to a second unrelated company, U.S.T. LLC in partial payment for an order of electronics by M. Supply LLC.; (b) a wire transfer of drug proceeds in the amount of $5,500 to a third unrelated company, B.P. International in partial payment for an order of external hard drives

26

purchased by M. Supply LLC; and (c) a wire transfer of drug proceeds in the amount of $14,185.84 to a fourth unrelated company, C. Sales LLC in partial payment for an order of personal care electronics by M. Supply LLC on behalf of C. Trade LLC.

COUNT THREE

[18 U.S.C. § 1956(a)(3)(B)]

[DEFENDANT THOMPSON]

On or about February 11, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant JEFFREY MARK THOMPSON, aka "The Cowboy," knowingly conducted a financial transaction involving property that had been represented to him by a confidential informant acting at the direction of federal law enforcement agents authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of a specified unlawful activity, namely, drug trafficking, specifically, a wire transfer of $18,500 from his Pinnacle bank account xxxxxx2958 in the name of Rural Projects Investments, LLC to an undercover bank account in Los Angeles, California, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property.

COUNT FOUR

[18 U.S.C. § 1956(a)(3)(B)]

[DEFENDANT THOMPSON]

On or about March 3, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant JEFFREY MARK THOMPSON, aka "The Cowboy," knowingly conducted a financial transaction involving property that had been represented to him by a confidential informant acting at the direction of federal law enforcement agents authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of a specified unlawful activity, namely, drug trafficking, specifically, a wire transfer of $6,500 from his Pinnacle bank account xxxxxx2958 in the name of Rural Projects Investments, LLC to an undercover bank account in Los Angeles, California, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property.

COUNT FIVE

[18 U.S.C. § 1956(a)(3)(B)]

[DEFENDANT THOMPSON]

On or about March 12, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant JEFFREY MARK THOMPSON, aka "The Cowboy," knowingly conducted a financial transaction involving property that had been represented to him by a confidential informant acting at the direction of federal law enforcement agents authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of a specified unlawful activity, namely, drug trafficking, specifically, a wire transfer of $15,000 from his Pinnacle bank account xxxxxx2958 in the name of Rural Projects Investments, LLC to an undercover bank account in Los Angeles, California, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT SIX

[18 U.S.C. § 1956(a)(3)(B)]

[DEFENDANT THOMPSON]

On or about March 13, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant JEFFREY MARK THOMPSON, aka "The Cowboy," knowingly conducted a financial transaction involving property that had been represented to him by a confidential informant acting at the direction of federal law enforcement agents authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of a specified unlawful activity, namely, drug trafficking, specifically, a wire transfer of $10,000 from his Pinnacle bank account xxxxxx2958 in the name of Rural Projects Investments, LLC to an undercover bank account in Los Angeles, California, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property.

COUNT SEVEN

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A.  OBJECT OF THE CONSPIRACY

1.  Beginning on a date unknown, but no later than October 2015, and continuing to in or about March 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants DANIEL SHAUN ZILKE, also known as ("aka") "The Englishman," JUAN RACHID DERGAL-ZULBARAN, aka "Jorge Frangie," JEFFREY MARK THOMPSON, aka "The Cowboy," and GUSTAVO ADOLFO ALDANA-MARTINEZ, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally operate an unlicensed money transmitting business affecting interstate and foreign commerce, in violation of Title 18, United States Code, Sections 1960(a) and 1960(b)(1)(A),(B), and (C).

B.  MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

2.  The object of the conspiracy was to be accomplished, in substance, as follows:

a.  Defendants ZILKE, DERGAL-ZULBARAN, THOMPSON, and ALDANA-MARTINEZ would accept contracts from the owners of drug proceeds in the form of United States currency to integrate that currency into the legitimate banking system in exchange for a commission-based fee that was a percentage of the amount transferred. To facilitate the process of entering the drug proceeds into the legitimate banking system, defendants ZILKE, DERGAL-ZULBARAN, THOMPSON, and ALDANA-MARTINEZ would open and maintain bank accounts

either in their own names, the names of relatives, of third parties, or of businesses or other entities they controlled.

b. Defendants ZILKE and DERGAL-ZULBARAN would arrange to personally pick up or for a courier to pick up the drug proceeds in various cities around the United States where there were accumulations of drug proceeds in United States currency, including Chicago, New York, Atlanta, Columbus, Miami, and elsewhere.

c. Defendants ZILKE and DERGAL-ZULBARAN would then deposit the drug proceeds into the bank accounts they held for this purpose or contract with other money brokers to pick up and deposit the drug proceeds into bank accounts.

d. Defendants ZILKE and DERGAL-ZULBARAN would then wire transfer the drug proceeds to accounts held by defendants THOMPSON and ALDANA-MARTINEZ, and others known and unknown to the Grand Jury, for further transfer to accounts controlled by the drug trafficking organizations that owned the funds.

e. Defendants ZILKE, DERGAL-ZULBARAN, THOMPSON, and ALDANA-MARTINEZ would use multiple bank accounts and divide up the funds being deposited so that the amounts would not appear to be unusually large.

f. Defendants ZILKE, DERGAL-ZULBARAN, and THOMPSON, and others known and unknown to the Grand Jury would purchase cashier's checks with the illegal proceeds and deposit those cashier's checks in various third-party accounts.

g. Defendants ZILKE, DERGAL-ZULBARAN, THOMPSON, and ALDANA-MARTINEZ would then wire transfer the funds to accounts of businesses that held open invoices of customers located in Mexico, Colombia, and elsewhere, to pay for goods that were then shipped to

1  those foreign businesses and sold, with the proceeds of the sales of

2  goods to be returned to the owners of the illegal funds that is, the

3  drug traffickers who had sold the initial product.

4  C.  OVERT ACTS

5      3.   In furtherance of the conspiracy, and to accomplish the

6  object of the conspiracy, on or about the following dates, defendants

7  ZILKE, DERGAL-ZULBARAN, THOMPSON, and ALDANA-MARTINEZ, and others

8  known and unknown to the Grand Jury, committed various overt acts

9  within the Central District of California, and elsewhere, including,

10 but not limited to the Overt Acts 1 through 66 set out in Count One

11 Section C, of this Indictment, which are incorporated by reference,

12 as well as the following:

   On or about the following dates, defendant ZILKE deposited or

14 instructed co-conspirators and others known and unknown to the Grand

15 Jury to deposit large sums of United States currency that were the

16 proceeds of drug trafficking into defendant ZILKE's Capital MG

17 account at Wells Fargo Bank:

| Overt Act | Date | Amount | Cash or Check |
|---|---|---|---|
| 67. | 12/19/17 | $78,726 | Cash |
| 68. | 12/19/17 | $343,620 | Cash |
| 69. | 1/3/18 | $330,100 | Cash |
| 70. | 1/19/18 | $47,696 | Cash |
| 71. | 1/19/18 | $202,484 | Cashier's check |
| 72. | 1/22/18 | $52,617 | Cashier's check |

27  On or about the following dates, defendant ZILKE wire

28 transferred the above-listed funds to merchant accounts unrelated to

34

his business as directed by the drug traffickers or by others unknown acting on their behalf as follows:

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| 73. | 12/19/17 | $40,000 |
| 74. | 12/19/17 | $13,125 |
| 75. | 12/19/17 | $14,059 |
| 76. | 12/19/17 | $3,650 |
| 77. | 12/19/17 | $92,812.06 |
| 78. | 1/16/18 | $44,325 |
| 79. | 1/16/18 | $50,000 |
| 80. | 1/19/18 | $26,311 |
| 81. | 1/19/18 | $28,211 |
| 82. | 1/19/18 | $12,125 |
| 83. | 1/19/18 | $22,864 |
| 84. | 1/22/18 | $80,000 |
| 85. | 1/24/18 | $50,000 |

On or about the following dates, defendant ZILKE deposited the following amounts of United States currency that were the proceeds of drug trafficking into the ZILKE Bank of America account ending in 1268:

| Overt Act | Date | Amount | Cash or Check |
|:---:|:---:|:---:|:---:|
| 86. | 9/10/18 | $5,000 | Cash |
| 87. | 9/18/18 | $54,400 | Cash |
| 88. | 9/19/18 | $35,635 | Cash |
| 89. | 9/20/18 | $26,000 | Cashier's check from ZILKE B of A account |

35

| Overt Act | Date | Amount | Cash or Check |
|---|---|---|---|
| 90. | 9/27/18 | $50,000 | Cash |
| 91. | 9/28/18 | $71,791 | Cash |
| 92. | 9/28/18 | $9,650 | Cashier's check |
| 93. | 10/3/18 | $19,920 | Cash |
| 94. | 10/8/18 | $102,040 | Cash |
| 95. | 10/11/18 | $48,010 | Cash |
| 96. | 10/11/18 | $65,000 | Cashier's check |

On or about the following dates, defendant ZILKE wire transferred the following amounts of drug proceeds to merchant accounts unrelated to his business at the direction of the drug traffickers or others acting on their behalf:

| Overt Act | Date | Amount |
|---|---|---|
| 97. | 9/18/18 | $53,659 |
| 98. | 9/20/18 | $33,795 |
| 99. | 9/21/18 | $26,500 |
| 100. | 9/28/18 | $30,000 |
| 101. | 9/28/18 | $41,650 |
| 102. | 9/28/18 | $33,350 |
| 103. | 9/28/18 | $30,000 |
| 104. | 10/3/18 | $43,000 |
| 105. | 10/10/18 | $102,040 |
| 106. | 10/11/18 | $48,000 |
| 107. | 10/15/18 | $48,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| 108. | 10/16/18 | $11,000 |

On or about the following dates, defendant ZILKE made the following cash deposits and, in some instances, accompanying purchases of cashier's checks with drug proceeds using his Bank of America account ending in 1268:

| Overt Act | Date | Cash Deposit Amount | Cashier's Check Amount |
|-----------|------|---------------------|------------------------|
| 109. | 10/11/17 | 65,000 | |
| 110. | 11/9/17 | $84,611 | $35,034 |
| 111. | 8/23/18 | $6,000 | $34,000 |
| 112. | 8/27/18 | $20,055 | $180,005 |
| 113. | 9/10/18 | $5,000 | $185,240 |
| 114. | 9/19/18 | $54,400 | $108,300 |
| 115. | 9/19/18 | $35,635 | $38,030 |
| 116. | 9/28/18 | $71,790 | $101,520 |
| 117. | 10/3/18 | $59,950 | |
| 118. | 10/10/18 | $102,041 | $186,030 |
| 119. | 10/11/18 | $48,010 | |

On or about the following dates, defendant THOMPSON received drug proceeds to his Peace Through Water Foundation account at Wells Fargo Bank, account number xxxxx7024, and wire transferred those drug proceeds as directed by the drug traffickers to third-party accounts as follows:

| Overt Act | Date | Amount In | Date Out | Amount Out |
|-----------|------|-----------|----------|------------|
| 120. | 6/29/16 | $130,000 | 7/1/15 | $129,000 |
| 121. | 8/26/16 | $100,500<br><br>$10,500 | 8/30/16 | $106,000 |
| 122. | 1/19/17 | $9,800<br>$9,800<br>$9,800<br>$9,800<br>$6,000<br>$37,000 (cash) | 1/23/17 | $79,734 (cash withdrawal) |
| 123. | 2/8/17 | $28,700 | 2/9/17 | $27,980 |
| 124. | 2/16/17 | $107,500 | 2/21/17 | $105,000 |
| 125. | 8/31/17 | $2,000 (cash)<br>$135,000 (cashier's check) | 9/1/17 | $137,000 |
| 126. | 11/1/17 | $101,000 (cashier's check) | 11/6/17 | $65,000<br>$34,000 |
| 127. | 11/14/17 | $202,000 (cashier's check) | 11/17/17 | $62,507<br>$80,000<br>$57,493 |

128. On or about August 22, 2016, in the Central District of California, defendant ALDANA-MARTINEZ accepted a wire transfer of drug proceeds from an unknown sender that was in reality a DEA undercover bank account set up for the purpose of collecting and dispersing drug proceeds as directed by drug traffickers during undercover operations, in the amount of $242,500 to his Gamar Electronics account at Bank of America, Pico Rivera, California, within the Central District of California.

129. On or about August 29, 2016, in the Central District of California, defendant ALDANA-MARTINEZ accepted a wire transfer of drug proceeds from an unknown sender that was in reality a DEA undercover bank account set up for the purpose of collecting and

dispersing drug proceeds as directed by drug traffickers during undercover operations, in the amount of $44,240 to his Gamar Electronics account at Bank of America, Pico Rivera, California, within the Central District of California.

130. On or about August 30, 2016, in the Central District of California, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $6,350 to the account of an unrelated company, G. Technology Inc., in partial payment for an order of electronics in the name of a second unrelated company, A. Enterprise Inc.

131. On or about August 30, 2016, in the Central District of California, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $10,300 to the account of an unrelated company, N. Supplies Inc, in partial payment for an order in the name of a second unrelated company, A. Enterprise Inc.

132. On or about August 31, 2016, in the Central District of California, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $30,750 to the account of an unrelated company, M. Distributing, in partial payment for an order in the name of a company called Z.F.D.

133. On or about August 31, 2016, in the Central District of California, defendant ALDANA-MARTINEZ sent a wire transfer of drug proceeds in the amount of $81,987 to the account of an unrelated company, C. Trade LLC, which wire funded a wire transfer of drug proceeds in the amount of $27,930 to the account of a second unrelated company, M.M. Export, in partial payment for an order of cellphones by C. Trade LLC.

134. On or about August 31, 2016, in the Central District of California, defendant ALDANA-MARTINEZ wire transferred drug proceeds in the amount of $82,345 to the account of an unrelated company, M. Supply LLC, which wire funded (a) a wire transfer of drug proceeds in the amount of $32,423.50 to a second unrelated company, U.S.T. LLC in partial payment for an order of electronics by M. Supply LLC.; (b) a wire transfer of drug proceeds in the amount of $5,500 to a third unrelated company, B.P. International in partial payment for an order of external hard drives purchased by M. Supply LLC; and (c) a wire transfer of drug proceeds in the amount of $14,185.84 to a fourth unrelated company, C. Sales LLC in partial payment for an order of personal care electronics by M. Supply LLC on behalf of C. Trade LLC.

135. On or about February 11, 2020, defendant THOMPSON wire transferred $18,500 that had been represented to him by defendant ZILKE, who was acting at the direction of law enforcement agents, to be the proceeds of illegal drug trafficking, from defendant THOMPSON's Rural Projects Investments account at Pinnacle Bank to an undercover account at City National Bank, Los Angeles, California.

136. On or about March 3, 2020, defendant THOMPSON wire transferred $6,500 that had been represented to him by defendant ZILKE, who was acting at the direction of law enforcement agents, as the proceeds of illegal drug trafficking, from defendant THOMPSON's Rural Projects Investments account at Pinnacle Bank to an undercover account at City National Bank, Los Angeles, California.

137. On or about March 12, 2020, defendant THOMPSON wire transferred $15,000 that had been represented to him by defendant ZILKE, who was acting at the direction of law enforcement agents, as the proceeds of illegal drug trafficking, from defendant THOMPSON's

Rural Projects Investments account at Pinnacle Bank to an undercover account at City National Bank, Los Angeles, California.

138. On or about March 13, 2020, defendant THOMPSON wire transferred the remaining $10,000 from the $50,000 in official government funds that had been represented to him by defendant ZILKE, who was acting at the direction of law enforcement agents, as the proceeds of illegal drug trafficking, from defendant THOMPSON's Rural Projects Investments account at Pinnacle Bank to an undercover account at City National Bank, Los Angeles, California.

1

COUNT EIGHT

2

[18 U.S.C. §§ 1960(b)(1)(A), (B), (C)]

3

[ALL DEFENDANTS]

4       Beginning on or about October 2015 and continuing through at

5   least April 2020, in Los Angeles County, within the Central District

6   of California, and elsewhere, defendants DANIEL SHAUN ZILKE, aka "The

7   Englishman," JUAN RACHID DERGAL-ZULBARAN, aka "Jorge Frangie,"

8   JEFFERY MARK THOMPSON, aka "The Cowboy," and GUSTAVO ADOLFO ALDANA-

9   MARTINEZ knowingly conducted, controlled, managed, supervised,

10   directed, and owned an unlicensed money transmitting business

11   affecting interstate and foreign commerce that: (1) operated without

12   an appropriate money transmitting license in California where such

13   operation is punishable as a felony under state law; (2) failed to

14   comply with the money transmitting business registration requirements

15   under Section 5330 of Title 31, United States Code, and the

16   regulations thereunder; and (3) involved the transportation and

17   transmission of funds that were known to defendants to have been

18   derived from a criminal offense and were intended to be used to

19   promote and support unlawful activity.

20

21

22

23

24

25

26

27

28

COUNT NINE

[18 U.S.C. § 1512(c)(2)]

[DEFENDANT ZILKE]

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.    The Federal Grand Jury was a group of citizens convened by the Court within the Central District of California, to determine whether there was sufficient evidence to charge an individual with a felony federal offense.

2.    The United States Attorney's Office ("USAO") for the Central District of California was a component of the Department of Justice, within the executive branch of the United States.

3.    The Drug Enforcement Administration ("DEA") was an agency of the executive branch of the government of the United States.

4.    The Federal Grand Jury, the USAO for the Central District of California, and DEA were conducting an inquiry into money laundering activities of persons, including Jeffrey Mark Thompson aka "The Cowboy" (the "Federal Grand Jury Investigation"), for which the Federal Grand Jury had issued subpoenas for bank records of the targets of the investigation and associated corporate and other business and charitable entities, in preparation for a Federal Grand Jury proceeding concerning those persons and entities.

5.    Beginning in or about January 2019, defendant DANIEL SHAUN ZILKE, also known as "The Englishman," contacted federal investigators, offered his cooperation to expose the money laundering organization, and signed an agreement with DEA that required him to "provide truthful information at all times."

43

6.    Under this agreement, defendant ZILKE provided information about the services provided to drug traffickers by the money laundering organization, the methods of laundering of drug proceeds for drug trafficking organizations, and about his coconspirators, defendants Juan Rachid Dergal-Zulbaran, Thompson, and others, known and unknown to the grand jury.

7.    Defendant ZILKE knew of the USAO investigation in the Central District of California and the assignment of a federal prosecutor, and defendant ZILKE knew of the likelihood of a Federal Grand Jury proceeding in the Central District of California.  As a cooperator, defendant ZILKE had a duty to provide truthful information and to disclose material information to federal investigators.

8.    In early 2019, in connection with the Federal Grand Jury Investigation, DEA caused an undercover bank account to be opened at City National Bank, located and headquartered in Los Angeles, California (the "Los Angeles Bank Account").

9.    On or about December 17, 2019, as part of the undercover Federal Grand Jury Investigation, and under the supervision of the USAO, DEA provided defendant ZILKE with $200,000 of government funds and instructed defendant ZILKE to provide the money to Thompson, so that Thompson could launder the money through fake charitable organizations that Thompson controlled, the Peace Through Water Foundation, Rural Projects Investments, and their associated bank accounts.

1  B.   DEFENDANT ZILKE CORRUPTLY OBSTRUCTED, INFLUENCED, AND IMPEDED AN

2       OFFICIAL PROCEEDING

3       10.   Beginning on or about January 2, 2020, until on or about

4  February 12, 2020, in Los Angeles County, within the Central District

5  of California and elsewhere, defendant DANIEL SHAUN ZILKE corruptly

6  obstructed, influenced, and impeded an official proceeding, that is,

7  a Federal Grand Jury Proceeding, by falsely stating that Jeffrey Mark

8  Thompson had $200,000 in official government funds that had been

9  given to him by defendant ZILKE, who was then acting in his capacity

10 as a government cooperator at the direction of federal investigative

11 agents, when, as defendant ZILKE well knew, defendant ZILKE had

12 stolen $150,000 of the official government funds from Thompson, as

13 follows:

14          a.   On or about December 17, 2019, at the direction of DEA

15 agents, defendant ZILKE delivered $200,000 in government funds to

16 Thompson and asked Thompson to wire transfer the funds less a

17 commission to the Los Angeles Bank Account.

18          b.   On or about January 2, 2020, unknown to the Grand

19 Jury, the USAO for the Central District of California, or DEA,

20 defendant ZILKE returned to Thompson's residence and stole $150,000

21 of the government's investigative funds.

22          c.   From on or about January 2, 2020, the date defendant

23 ZILKE stole the $150,000, until February 12, 2020, defendant ZILKE

24 concealed from federal investigators that Thompson no longer

25 possessed the $200,000 that defendant ZILKE had delivered to Thompson

26 in December 2019, as federal investigators continued to investigate

27 Thompson's anticipated laundering of those funds.

28

d.    From on or about January 2, 2020, the date defendant ZILKE stole the $150,000, through February 12, 2020, defendant ZILKE recorded telephone calls between defendant ZILKE and Thompson and provided the recordings to federal investigators to create the false appearance that Thompson still possessed the $200,000, including the $150,000 that defendant ZILKE had stolen.

e.    On or about February 12, 2020, for the purpose of deceiving federal investigators, during recorded calls with those investigators, defendant ZILKE denied taking the $150,000 of government funds from Thompson on January 2, 2020.

f.    On or about February 12, 2020, for the purpose of deceiving federal investigators, defendant ZILKE called Thompson on the telephone and, during a recorded call, insisted that Thompson still possessed the entire $200,000 that defendant ZILKE delivered to Thompson in December 2019, even though defendant ZILKE knew he had stolen $150,000 of the money on or about January 2, 2020.

COUNT TEN

[18 U.S.C. § 1001(a)(1)]

[DEFENDANT ZILKE]

A.  INTRODUCTORY ALLEGATIONS

1.    The Introductory Allegations set forth in Count Nine, Section A of this Indictment are re-alleged and incorporated herein by reference.

B.  SCHEME TO FALSIFY AND CONCEAL MATERIAL FACTS

2.    From on or about January 2, 2020, to on or about February 12, 2020, in Los Angeles County, within the Central District of California, in connection with and influencing and affecting a Federal Grand Jury Proceeding in the Central District of California, in matters within the jurisdiction of the judicial branch of the government of the United States, namely, the Federal Grand Jury for the Central District of California, and within the jurisdiction of the executive branch of the government of the United States, namely, the USAO for the Central District of California and DEA, defendant ZILKE knowingly and willfully falsified, concealed, and covered up by trick, scheme, and device material facts, namely, that defendant ZILKE had stolen approximately $150,000 of government funds being used for the Federal Grand Jury Investigation and that the target of the Federal Grand Jury Investigation, Thompson, could not complete the financial money laundering transaction because Thompson no longer possessed all of the government funds.

C.  OPERATION OF THE SCHEME TO FALSIFY AND CONCEAL MATERIAL FACTS

3.    The scheme operated as follows:

a.    On or about December 17, 2019, at the direction of DEA agents, defendant ZILKE delivered $200,000 in government funds to

47

Thompson and asked Thompson to wire the funds less a commission to the Los Angeles Bank Account.

b. On or about January 2, 2020, unknown to the Grand Jury, the USAO for the Central District of California, or DEA, defendant ZILKE returned to Thompson's residence and stole $150,000 of the government's investigative funds.

c. From on or about January 2, 2020, the date defendant ZILKE stole the $150,000, through February 12, 2020, defendant ZILKE concealed from federal investigators that Thompson no longer possessed the $200,000 that defendant ZILKE had delivered to Thompson in December 2019, as federal investigators continued to investigate Thompson's anticipated laundering of those funds.

d. From on or about January 2, 2020, the date defendant ZILKE stole the $150,000, through February 12, 2020, defendant ZILKE recorded telephone calls between defendant ZILKE and Thompson and provided the recordings to federal investigators to create the false appearance that Thompson still possessed the $200,000, including the $150,000 that defendant ZILKE had stolen.

e. On or about February 12, 2020, during recorded calls with federal investigators, and for the purpose of deceiving those federal investigators, defendant ZILKE denied taking the $150,000 of government funds from Thompson on January 2, 2020.

f. On or about February 12, 2020, for the purpose of deceiving federal investigators, defendant ZILKE called Thompson on the telephone and, during a recorded call in the presence of those federal investigators, insisted that Thompson still possessed the entire $200,000 that defendant ZILKE delivered to Thompson in

1 │ December 2019, even though defendant ZILKE knew he had stolen

2 │ $150,000 of the money on or about January 2, 2020.

FORFEITURE ALLEGATION ONE

[21 U.S.C. § 853]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853, in the event of any defendant's conviction of the offense set forth in Count One of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from such offense;

(b)   All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offense; and

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.   Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1                    FORFEITURE ALLEGATION TWO

2                        [18 U.S.C. § 982]

3      1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States will seek

5  forfeiture as part of any sentence, pursuant to Title 18, United

6  States Code, Section 982(a)(1), in the event of any defendant's

7  conviction of the offenses set forth in any of Counts Two through

8  Eight of this Indictment.

9      2.   Any defendant so convicted shall forfeit to the United

10 States of America the following:

11         (a)   Any property, real or personal, involved in such

12 offense, and any property traceable to such property; and

13         (b)   To the extent such property is not available for

14 forfeiture, a sum of money equal to the total value of the property

15 described in subparagraph (a).

16     3.   Pursuant to Title 21, United States Code, Section 853(p), as

17 incorporated by Title 18, United States Code, Section 982(b)(1), and

18 Title 18, United States Code, Section 982(b)(2), any defendant so

19 convicted shall forfeit substitute property, if, by any act or

20 omission of said defendant, the property described in the preceding

21 paragraph, or any portion thereof: (a) cannot be located upon the

22 exercise of due diligence; (b) has been transferred, sold to, or

23 deposited with a third party; (c) has been placed beyond the

24 jurisdiction of the court; (d) has been substantially diminished in

25 value; or (e) has been commingled with other property that cannot be

26 divided without difficulty. Substitution of assets shall not be

27 ordered, however, where the convicted defendant acted merely as an

28 intermediary who handled but did not retain the property in the

1  course of the money laundering offense unless the defendant, in

2  committing the offense or offenses giving rise to the forfeiture,

3  conducted three or more separate transactions involving a total of

4  $100,000.00 or more in any twelve-month period.

1                    FORFEITURE ALLEGATION THREE

2          [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3      1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States of America

5 will seek forfeiture as part of any sentence, pursuant to Title 18,

6 United States Code, Section 981(a)(1)(C) and Title 28, United States

7 Code, Section 2461(c), in the event of the defendant's conviction of

8 the offenses set forth in any of Counts Nine and Ten of this

9 Indictment.

10      2.    The defendant, if so convicted, shall forfeit to the United

11 States of America the following:

12          (a)   All right, title and interest in any and all property,

13 real or personal, constituting, or derived from, any proceeds

14 traceable to any such offense; and

15          (b)   To the extent such property is not available for

16 forfeiture, a sum of money equal to the total value of the property

17 described in subparagraph (a).

18      3.    Pursuant to Title 21, United States Code, Section 853(p),

19 as incorporated by Title 28, United States Code, Section 2461(c), the

20 defendant, if so convicted, shall forfeit substitute property, up to

21 the total value of the property described in the preceding paragraph

22 if, as the result of any act or omission of the defendant, the

23 property described in the preceding paragraph, or any portion

24 thereof: (a) cannot be located upon the exercise of due diligence;

25 (b) has been transferred, sold to or deposited with a third party;

26 (c) has been placed beyond the jurisdiction of the court; (d) has

27 //

28 //

been substantially diminished in value; or (e) has been commingled
with other property that cannot be divided without difficulty.

A TRUE BILL


_____/S/_____
Foreperson


E. MARTIN ESTRADA
United States Attorney


SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

SHAWN J. NELSON
Assistant United States Attorney
Chief, International Narcotics,
Money Laundering, and
Racketeering Section

BENEDETTO L. BALDING
Assistant United States Attorney
Deputy Chief, International
Narcotics, Money Laundering, and
Racketeering Section

JULIE J. SHEMITZ
Assistant United States Attorney
International Narcotics, Money
Laundering, and Racketeering
Section